JS 44 (Rev. 12/07) (CAND Rev 1/10)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

JUSTINE LEVY, on behalf of herself and those similarly situated

## DEFENDANTS

AMERICAN SOCIETY FOR REPRODUCTIVE MEDICINE and SOCIETY FOR ASSISTED REPRODUCTIVE TECHNOLOGY

**(b)** County of Residence of First Listed Plaintiff  Humboldt
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

L. Timothy Fisher
Bursor & Fisher, P.A.
2121 N. California Blvd Suite 1010
Walnut Creek, CA 94596          Telephone: (925) 482-1515

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [X] 3  Federal Question (U.S. Government Not a Party)
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal | [X] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Med. Malpractice | [ ] 625 Drug Related Seizure | 28 USC 157 | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury — | of Property 21 USC 881 | | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product | [ ] 650 Airline Regs. | [ ] 830 Patent | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted | Liability | Liability | [ ] 660 Occupational | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| Student Loans | [ ] 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | [ ] 490 Cable/Sat TV |
| (Excl. Veterans) | [ ] 345 Marine Product | [ ] 370 Other Fraud | [ ] 690 Other | | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment | Liability | [ ] 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | [ ] 850 Securities/Commodities/ |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal | [ ] 710 Fair Labor Standards | [ ] 861 HIA (1395ff) | Exchange |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | Property Damage | Act | [ ] 862 Black Lung (923) | [ ] 875 Customer Challenge |
| [ ] 190 Other Contract | Product Liability | [ ] 385 Property Damage | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | Product Liability | [ ] 730 Labor/Mgmt.Reporting | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| [ ] 196 Franchise | | | & Disclosure Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | | [ ] 892 Economic Stabilization Act |
| | | | [ ] 790 Other Labor Litigation | | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate | [ ] 791 Empl. Ret. Inc. | **FEDERAL TAX SUITS** | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | Sentence | Security Act | | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ | **Habeas Corpus:** | | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | Accommodations | [ ] 530 General | | or Defendant) | [ ] 900 Appeal of Fee |
| [ ] 245 Tort Product Liability | [ ] 444 Welfare | [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party | Determination |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities – | [ ] 540 Mandamus & Other | **IMMIGRATION** | 26 USC 7609 | Under Equal Access |
| | Employment | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | | to Justice |
| | [ ] 446 Amer. w/Disabilities – | [ ] 555 Prison Condition | [ ] 463 Habeas Corpus – | | [ ] 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | [ ] 440 Other Civil Rights | | [ ] 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  another district (specify)  Transferred from
- [ ] 6  Multidistrict Litigation
- [ ] 7  Judge from Magistrate Judgment  Appeal to District

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Sherman Antitrust Act, Section 1,  15 U.S.C. 1

Brief description of cause:
Class action on behalf of women who sold human egg donor services & were undercompensated due to illegal price fixing

## VII. REQUESTED IN COMPLAINT:

- [X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:  [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".  Kamakahi v. ASRM et al, Case No. 4:11-cv-01781 SBA

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

- [X] SAN FRANCISCO/OAKLAND
- [ ] SAN JOSE
- [ ] EUREKA

DATE  8/2/11

SIGNATURE OF ATTORNEY OF RECORD

E-filing

1 **BURSOR & FISHER, P.A**.
   L. Timothy Fisher (State Bar No. 191626)
2 Sarah N. Westcot (Sate Bar No. 264916)
   2121 North California Boulevard, Suite 1010
3 Walnut Creek, CA 94596
   Telephone: (925) 482-1515
4 Facsimile: (925) 407-2700
   E-Mail: ltfisher@bursor.com
5     swestcot@bursor.com

6 **BURSOR & FISHER, P.A.**
   Scott A. Bursor (State Bar No. 276006)
7 369 Lexington Avenue, 10th Floor
   New York, NY 10017
8 Telephone: (212) 989-9113
   Facsimile: (212) 989-9163
9 E-Mail: scott@bursor.com

10 *Attorneys for Plaintiff*

FILED
AUG – 2 2011
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

11                UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13
                                                     Case No.  **C11-03803**
14   JUSTINE LEVY, on behalf of herself and those
     similarly situated,

15                        Plaintiff               **CLASS ACTION COMPLAINT**
                   v.
16                                                **JURY TRIAL DEMANDED**
     AMERICAN SOCIETY FOR REPRODUCTIVE
17   MEDICINE and SOCIETY FOR ASSISTED
     REPRODUCTIVE TECHNOLOGY,
18
                          Defendants.
19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

Plaintiff Justine Levy, by her undersigned attorneys, brings this class action complaint against the American Society for Reproductive Medicine ("ASRM") and the Society for Assisted Reproductive Technology ("SART") (collectively "Defendants"). Plaintiff's allegations are based upon personal knowledge as to her own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      This is a class action on behalf of women who sold human egg donor services to a member of the Defendant Class and were significantly undercompensated due to the illegal price fixing agreements entered into by Defendants.

2.      The maximum allowable compensation for egg donor services has been the same since Defendants began fixing prices eleven years ago.

3.      Defendants have been engaging in illegal price fixing in the reproductive technology market since 2000 when ASRM promulgated rules establishing the maximum compensation its members should pay for egg donor services. SART then agreed to adopt the newly developed maximum price rules for its members.

4.      Defendants established the maximum price rules in an effort to keep egg donor compensation artificially low and to retain more revenue for themselves and the fertility clinics and egg donor agencies that make up the Defendant Class.

5.      Defendants ASRM and SART disguise their price fixing agreements as ethical guidelines. However, the maximum price rules set by Defendants are not merely ethical guidelines, but strict rules that must be followed as a condition of membership. To become a SART member fertility clinic, the clinic must agree to abide by Defendants maximum prices rules. Similarly, members of ASRM must agree to "adhere to the objectives of the Society."

6.      According to their website, SART is the primary organization of professionals practicing assisted reproductive technologies in the United States.[1] The organization includes over 393 member clinics, representing over 85% of the assisted reproductive technology clinics in the United States.

---

[1] http://www.sart.org/detail.aspx?id=1864

1   7.   The ASRM is a "multidisciplinary organization dedicated to the advancement of the

2   art, science, and practice of reproductive medicine."[2]   The society facilitates and sponsors

3   educational activities for the public and continuing medical educational activities for professionals

4   who are engaged in the practice of reproductive medicine.  The ASRM's Ethics Committee

5   developed the maximum price rules that formed the basis for Defendants' price fixing agreements.

6   8.   Defendants originally determined the maximum prices rules for egg donor services

7   based on the typical hourly rates paid to men donating sperm.  The maximum price rules do not take

8   into account the time, discomfort, health risks or possibility of future medical complications that

9   come with donating human eggs.  Nor do they take into account any adjustment for cost of living

10   changes within the past eleven years.

11   9.   The compensation paid to members of the proposed Class is significantly lower than

12   the market rate as a direct result of Defendants' price fixing agreements.

13   10.   Plaintiff Justine Levy sold egg donor services directly to Seattle Reproductive

14   Medicine, a fertility clinic and egg donor agency with 13 physicians, of whom 12 are members of

15   ASRM.  Levy's compensation was artificially low as a result of Defendants' price fixing.

16   **THE PARTIES**

17   11.   Plaintiff Justine Levy is a citizen of California who resides in Arcata, California.

18   Levy sold egg donor services to Seattle Reproductive Medicine in Seattle, Washington in or around

19   February 2008.  In exchange for her services she was paid $3,500.

20   12.   Defendant American Society for Reproductive Medicine ("ASRM") is an

21   organization "devoted to advancing knowledge and expertise in reproductive medicine."  ASRM

22   membership is multidisciplinary, consisting of medical professionals and corporations located

23   throughout the United States.  It is incorporated in California, with headquarters located at 1209

24   Montgomery Highway Birmingham, Alabama and a public relations office located in Washington,

25   D.C.  A central function of ASRM's Ethics Committee is the publication of "ethics reports" setting

26   forth certain ethical standards for reproductive professional, and a central function of ASRM's

27

28   [2] http://asrm.org/mission/

1  Practice Committee is to promulgate guidelines and standards to be followed by reproductive

2  professionals.  There are many ASRM members located within this district, some of which are

3  listed on ASRM's website.  ASRM is being sued on its own behalf and as a class representative on

4  behalf of the Defendant Class defined in greater detail below.

5        13.  Defendant Society for Assisted Reproductive Technology ("SART") is the "primary

6  organization of professionals dedicated to the practice of assisted reproductive technologies in the

7  United States."  SART headquarters are located at 1209 Montgomery Highway Birmingham

8  Alabama, the same address as its affiliate ASRM.  According to its website, there are over 393

9  member clinics, representing over 85% of the assisted reproductive technology clinics in the United

10  States.  There are many SART member clinics located in this district, some of which are listed on

11  SART's website. SART's self-proclaimed mission is "to promote and advance the standards for the

12  practice of assisted reproductive technology" including issuing practice opinions, guidelines and

13  standards for the ART field.  SART is being sued on its own behalf and as a class representative on

14  behalf of the Defendant Class defined in greater detail below.

15  **JURISDICTION AND VENUE**

16        14.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

17  question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under

18  Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§

19  15(a) and 26.  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. §1332(d), in

20  that this is class action in which there are more than 100 class members and the aggregate amount in

21  controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class

22  member is a citizen of a state different from Defendants.

23        15.  This Court has personal jurisdiction over Defendants because Defendants conduct

24  substantial business within California, such that Defendants have significant, continuous and

25  pervasive contacts with the State of California.  Defendants were engaged in a in an illegal

26  anticompetitive scheme that was directed at and had the effect of causing injury to persons residing

27  in, located in, or doing business throughout the United States, including in this District.  Defendant

28

1   ASRM is also registered with the California Secretary of State to conduct business within

2   California.

3       16.     Venue is proper in this judicial district because Defendants reside, are found, have

4   agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in

5   Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§15 and 22.

6                         **CLASS ACTION ALLEGATIONS**

7   **Plaintiff Class**

8       17.     Plaintiff brings this action under Federal Rules of Civil Procedure 23(b)(2) and

9   (b)(3) on her own behalf and on behalf of the following Plaintiff Class:

10            All women who, at any time during the last four years (the "Class Period"), sold

11            human oocytes for assisted reproductive purposes, within the United States, to any

12            Defendant Class member.

13       18.     Members of the Class are so numerous that their individual joinder herein is

14   impracticable. On information and belief, members of the Plaintiff Class number in the tens of

15   thousands. The precise number of Class members and their identities are unknown to Plaintiff at

16   this time but will be determined through discovery. Class members may be notified of the

17   pendency of this action by mail and/or publication through the distribution records of Defendants.

18       19.     Common questions of law and fact exist as to all Plaintiff Class members and

19   predominate over questions affecting only individual Plaintiff Class members. Common legal and

20   factual questions include, but are not limited to:

21            a)     whether  Defendants entered into an agreement, contract or conspiracy

22   among themselves to set, maintain or stabilize the prices of human egg donor services in the United

23   States;

24            b)     whether the price of human egg donor services was artificially low as a result

25   of Defendants' conduct;

26            c)     whether Defendants' conduct resulted in injury to members of the Plaintiff

27   Class and, if so, the proper measure of damages;

28

1           d)      whether an injunction should be issued voiding the maximum price rules for

2 human egg donor services.

3      20.     Plaintiff's claims are typical of the claims of Plaintiff Class because Plaintiff and

4 each member of the Class sold egg donor services at artificially low levels as a result of the anti-

5 competitive actions of the Defendant Class and the restraint of trade alleged herein. Plaintiff and the

6 members of the Plaintiff Class have suffered damages compensable under federal antitrust law.

7      21.     Plaintiff is an adequate representative of the Plaintiff Class because her interests do

8 not conflict with the interests of the Plaintiff Class members she seeks to represent, she has retained

9 competent counsel experienced in prosecuting class actions, and she intends to prosecute this action

10 vigorously. The interests of Plaintiff Class members will be fairly and adequately protected by

11 Plaintiff and her counsel.

12      22.     The class mechanism is superior to other available means for the fair and efficient

13 adjudication of the claims of Plaintiff and Plaintiff Class members. Each individual Class member

14 may lack the resources to undergo the burden and expense of individual prosecution of the complex

15 and extensive litigation necessary to establish Defendants' liability. Individualized litigation

16 increases the delay and expense to all parties and multiplies the burden on the judicial system

17 presented by the complex legal and factual issues of this case. Individualized litigation also

18 presents a potential for inconsistent or contradictory judgments. In contrast, the class action device

19 presents far fewer management difficulties and provides the benefits of single adjudication,

20 economy of scale, and comprehensive supervision by a single court. Class treatment will ensure

21 that all claims and claimants are before this Court for consistent adjudication of the liability issues.

22 **Defendant Class**

23      23.     Plaintiff brings this action under Federal Rules of Civil Procedure 23(b)(2) and

24 (b)(3) against the following Defendant Class:

25           ASRM, SART, and all fertility clinics and human egg donor agencies that agreed to

26           comply with SART/ASRM maximum price rules for human egg donor services at

27

28

1    any time within the last four years.  Excluded from the Defendant Class are all

2    fertility clinics and human egg donor agencies located in the state of Indiana.

3    24.    Defendants ASRM and SART are class representatives.

4    25.    Members of the Defendant Class are so numerous that their individual joinder herein

5    is impracticable.  On information and belief, members of the Defendant Class number in the

6    hundreds.  Class members may be notified of the pendency of this action by mail and/or

7    publication through the distribution records of Defendants.

8    26.    Defendant Class members were engaged in an illegal anticompetitive scheme that

9    was directed at and had the intended effect of causing injury to persons residing in, located in, or

10   doing business in this District.

11   27.    Defendant Class members demonstrate membership in the Defendant Class by virtue

12   of membership in SART or ASRM, or in the case of human egg donor agencies, by agreeing to the

13   maximum price rules for human egg donor services.

14   28.    Common questions of law and fact exist as to all Defendant Class members and

15   predominate over questions affecting only individual Defendant Class members.  Common legal

16   and factual questions include, but are not limited to:

17        a)  whether  Defendants entered into an agreement, contract or conspiracy among

18            themselves to set, maintain or stabilize the prices of human egg donor services in

19            the United States;

20        b)  whether the price of human egg donor services was artificially low as a result of

21            Defendants' conduct;

22        c)  whether Defendants' conduct resulted in injury to members of the Plaintiff Class

23            and, if so, the proper measure of damages;

24   29.    Each member of the Defendant Class is jointly and severally liable for the total

25   damages caused by the Defendant Class.

26

27

28

CLASS ACTION COMPLAINT                                                                                6

1     30.    Defendants are typical of the Defendant Class. Defendants have injured Plaintiffs

2 and the Plaintiff Class by participating in the antitrust conspiracy alleged herein, as have all other

3 Defendant Class members.

4     31.    Defendants will fairly and adequately protect the interests of the members of the

5 Defendant Class.

6     32.    The class mechanism is superior to other available means for the fair and efficient

7 adjudication of the claims as joinder of all Defendant Class members is impractical. Instituting

8 separate actions against individual Defendant Class members would impose burden on the judicial

9 system and present a potential for inconsistent or contradictory judgments. In contrast, the class

10 action device presents far fewer management difficulties and provides the benefits of single

11 adjudication, economy of scale, and comprehensive supervision by a single court.

12 **RELEVANT MARKET**

13     33.    Defendants' Maximum Price Agreement is *per se* illegal and requires no allegations

14 of market definition.

15     34.    Plaintiffs also allege, in the alternative, that the Maximum Price Agreement is

16 anticompetitive and illegal under the Rule of Reason.

17     35.    For purposes of the Rule of Reason, the Relevant Product Market is the market for

18 the purchase of egg donor services. The Defendant Class controls over 85% of the relevant market.

19     36.    The relevant Geographic Market is the United States

20 **INTERSTATE TRADE AND COMMERCE**

21     37.    The business activities of Defendants that are the subject of this action were within

22 the flow of, and substantially affected, interstate trade and commerce.

23     38.    During the Class Period, Defendants transacted business in multiple states in a

24 continuous and uninterrupted flow of interstate commerce throughout the United States.

25

26

27

28

1

## FACTS

2 **Assisted Reproductive Eggs**

3      39.      Assisted reproductive eggs (also known as oocytes") are a necessary component of
4   human reproduction.

5      40.      While most oocytes are naturally produced by women who become pregnant, some
6   are provided by females who provide egg donor services.

7      41.      Assisted Reproductive Technology (ART) is a term generally referring to methods
8   used to achieve pregnancy by artificial or partially artificial means.  One of the most prevalent ART
9   techniques is in vitro fertilization (IVF).  In cases where a woman has no oocytes due to surgery,
10  chemotherapy, genetic causes, or has poor egg quality, previously unsuccessful IVF treatments, or
11  advanced maternal age, egg donor services may be utilized through the IVF process.

12 **The Egg Donation Process**

13      42.      Egg donation is the process by which a woman provides one or several oocytes for
14  purposes of assisted reproduction.

15      43.      Potential egg donors undergo through physical including a pelvic exam screening for
16  infectious diseases including gonorrhea, chlamydia, syphilis, hepatitis B and C, HTLV-1 and HIV, a
17  blood draw to check hormone levels, and an ultrasound to examine the ovaries, uterus and other
18  pelvic organs.  Potential egg donors are also referred to a psychologist who evaluates if she is
19  mentally prepared to undertake and complete the donation process.

20      44.      Potential egg donors are required to provide a detailed medical and psychological
21  history for themselves and all close blood relatives.

22      45.      If the potential egg donor passes all screening tests and is selected as an egg donor,
23  the donation process begins.

24      46.      The actual donation process beings with the egg donor beginning a series of birth
25  controls pills to synchronize the donor's cycle with the recipients.  The donor then receives a series
26  of injections that halt the normal functioning of the donor's ovaries.  The injections are
27  administered on a daily basis for a period of three weeks.  During this three week period, the donor

28

1   cannot have unprotected sex, smoke, or drink alcohol, and must receive permission to take any
2   other drugs.

3        47.     Short-term side effects during treatment include mood swings, fluid retention, and
4   enlarged ovaries.

5        48.     Next, follicle-stimulating hormones are given to the donor to stimulate egg
6   production and increase the number of mature oocytes produced by the ovaries.

7        49.     Throughout the egg donation process, the donor routinely sees the overseeing
8   physician for blood tests and ultrasound exams to determine the donor's reaction to the hormones
9   and the progress of follicle growth.

10       50.     Once the oocytes are determined to be mature, the donor must administer one last
11  hormone injection approximately 36 hour prior to egg retrieval.

12       51.     The egg retrieval process is completed through a surgical procedure called
13  transvaginal ovarian aspiration, which is performed under sedation.  A small ultrasound-guided
14  needle is inserted in both ovaries to extract the mature oocytes.  The surgery requires approximately
15  two hours of rest in a recovery room before the donor is released, and may require several days of
16  restricted activity to recover.

17       52.     Egg donors may suffer complications as a result of the egg donation process.
18  Potential complications include bleeding from the oocyte recovery procedure, negative reaction to
19  the hormone injections, ovarian hyperstimulation syndrome, and liver failure.

20  **The Donor Services Market**

21       53.     Individuals seeking to utilize oocytes for IVF treatment may do so by one of four
22  means:

23            a)  Egg donation by a designated donors, either a close friend or family member;

24            b)  Egg donation through a full-service fertility clinic's paid recruitment program;

25            c)  Egg donation through an egg donation agency that recruits through a paid
26                provider program;

27

28

CLASS ACTION COMPLAINT                                                          9

1
2

          d)  Egg donation directly recruiting by the person seeking to acquire services, either independently or through a broker, agent or other intermediary.

3      54.    The majority of egg donations are made by women who are compensated for their
4  services.  Payment is necessary to provide incentive for egg donors to go through the long and
5  painful process of providing eggs.  Most donors are recruited with the promise of compensation for
6  the egg donor services including the time, effort, discomfort, and health risks resulting from the
7  medical procedures involved.

8      55.    The egg donor services market involves sales of approximately $80 million annually.

9      56.    The reproductive technology market for egg donor services is largely self-regulated.
10  There are no federal laws or regulations governing compensation for egg donation services.
11  However, two states have set their own laws governing egg donation compensation.  In Louisiana,
12  payment for egg donation services is barred by state law.  Indiana allows payment for egg donation
13  services, but has instituted a statutory cap on such payments.

14      57.    Assisted reproductive technology professionals agree to abide by ethical and
15  professional standards promulgated by ASRM's Ethics Committee and ASRM's Practice
16  Committee.  All SART member fertility clinics must agree to abide by ASRM standards as a
17  condition of membership.  Similarly, ASRM members must agree to "adhere to the objectives of the
18  Society."  One commentator has noted this agreement "is intended to discourage any possible
19  governmental legislation that would encumber the free practice U.S. doctors now enjoy."

20      58.    SART, ASRM, and their member clinics openly admit that they have agreed to
21  comply with ASRM's rules.  For example, a September 25, 2009 press release issued by ASRM
22  noted that clinics who wish to become members of SART are "required to" agree to "[a]dhere to all
23  standards and recommendations of the ASRM Practice Committee" and to "[a]dhere to all standards
24  and recommendations of the ASRM Ethics Committee."

25      59.    Similarly, a "frequently asked questions" page on SART's website notes that "SART
26  members must agree to…abide by all practice, laboratory, ethical, and advertising guidelines" as

27
28

1  part of SART's "rigorous requirements for membership." These practices and "ethical guidelines"

2  include rules establishing the maximum allowable price of egg donor compensation.

3       60.    In February of 2006, SART sent a letter to certain AR egg agencies noting that

4  fertility clinics must "comply with...ASRM and SART guidelines as a requirement of SART

5  membership."

6       61.    SART member clinics comprise approximately 85% of the assisted reproductive

7  clinics in the United States. One observer has notes that "[a]lmost uniformly, the major,

8  mainstream IVF clinics are SART members and therefore 'SART' complaint.'"

9  **The Illegal Price Fixing Agreements**

10       62.    ASRM has long been concerned about the prices paid to egg providers for human

11  egg donation services, and have promulgated ethical guidelines concerning such payments since at

12  least 1994.

13       63.    Prior to 2000, ASRM's standards of practice merely states that compensation for

14  human egg donation services "should not be so excessive as to constitute undue inducement" but

15  neither organization had established a specific maximum price.

16       **ASRM Establishes an Artificially Low Fixed Price of Human Egg Donor Services**

17       64.    In 2000, ASRM, SART, and its members determined they would formally suppress

18  the price paid to providers of human egg donation services.

19       65.    In 2000, ASRM's Ethics Committee promulgated a report titled "Financial

20  Incentives in Recruitment of AR Egg Providers." ("2000 Maximum Price Report").

21       66.    The 2000 Maximum Price Report specifically set forth rules establishing maximum

22  compensation for providers of human egg donor services. The report stated "at this time sums of

23  $5,000 or more require justification and sums above $10,000 go beyond what is appropriate."

24       67.    The rates set forth in the 2000 Maximum Price Report were originally established

25  based on the going market rates for sperm donation. The average price a sperm donor received for a

26  donation was computed into an hourly rate, then the hourly rate was multiplied by the number of

27

28

CLASS ACTION COMPLAINT                                                     11

1   hours it takes for an egg donor to donate eggs.  That number was then purportedly slightly adjusted
2   upwards to account for the additional inconveniences of egg donation.

3       68.    However, one commentator recently noted that egg donors receive an "average
4   hourly compensation of between roughly $75-$93 for time spent in a medical setting, about the
5   same as hourly sperm donor rates."

6       69.    In 2007, ASRM reaffirmed the $5,000 and $10,000 Maximum Price Rules in a report
7   titled "Financial Compensation of Oocyte Donors." ("2007 Maximum Price Report").

8       70.    The rates set in the 2000 Maximum Price Rules have never increased in the eleven
9   years since they were initially promulgated.

10      71.    ASRM's Practice Committee has repeatedly issued rules requiring compliance with
11  the Maximum Price Rules.

12      72.    For example, the ASRM report entitled "2002 Guidelines for Gamete and Embryo
13  Donation" specifically noted the "[c]ompenstaion to the donor should be in compliance with the"
14  maximum prices set forth in the 2000 Maximum Price Report.

15      73.    The maximum prices rules were confirmed again in 2006 in ASRM's "2006
16  Guidelines for Gamete and Embryo Donation" which notes that [c]ompensation to [egg donors]
17  should be in compliance with the ASRM Ethics Committee report on the subject."

18      74.    ASRM's "2008 Guidelines for Gamete and Embryo Donation" made an identical
19  observation noting that "[c]ompensation to [egg donors] should be in compliance with the ASRM
20  Ethics Committee report on the subject."

21      **ASRM Member Medical Professionals Are Required to Adhere to ASRM's Maximum**
22      **Price Rules**

23      75.    According to the ASRM Vision Statement, ASRM members must "demonstrate the
24  high ethical principles of the medical profession, evince an interest in infertility, reproductive
25  medicine and biology, *and adhere to the objectives of the society.*"[3]

26
27
───────────────
28  [3] http://www.asrm.org/about/

CLASS ACTION COMPLAINT                                                                    12

1    76.    ASRM members are required to comply with all ethical guidelines set forth by the
2  ASRM's Ethics Committee.

3    77.    ASRM members have been required to adhere to the maximum compensation rules
4  for egg donor services as a condition of membership since the initial promulgation of the Maximum
5  Price Report in 2000.

6    78.    According to the ASRM Bylaws, membership may be terminated for ethical
7  violations.

8             **SART Member Fertility Clinics Institute ASRM's Maximum Price Rules**

9    79.    SART member clinics have agreed to "adhere to all standards and recommendations"
10  of ASRM's Practice and Ethics Committees as a requirement of their membership in SART.

11    80.    Consistent with this obligation, SART member fertility clinics agreed to abide by the
12  ASRM maximum price rules.

13    81.    This agreement was memorialized in, *inter alia*, a 2006 letter from SART indicating
14  that its members were required to agree to the ASRM maximum price rules.

15    82.    A survey of approximately 375 websites of SART member clinics found that that
16  mentioned the price for donor services, all of them were at or under $10,000.

17    83.    Moreover, certain SART member fertility clinics and egg donor agencies admit their
18  agreement to the ASRM maximum price rules on their websites.

19             **Egg Donor Agencies Institute ASRM's Maximum Price Rules**

20    84.    Because some SART member fertility clinics procure egg donor services from egg
21  agencies, egg agencies serving SART member fertility clinics have also agreed to comply with the
22  ASRM maximum price rules.

23    85.    In May 2005, SART sent a letter to independent egg donation agencies informing
24  them that all egg donation agencies serving SART member clinics were expected to agree to
25  comply with the ASRM maximum price rules, and requesting those agencies sign an agreement to
26  abide by those rules and inform the SART member clinics with whom they worked of their
27  agreement. In exchange, egg agencies signing the agreement would be listed on SART's website,
28

1  and their names would be provided to two national infertility organizations (RESOLVE and the

2  American Fertility Organization) to provide information to patients seeking guidance in their efforts

3  to locate egg donation services.

4    86. Many egg donation agencies did so, including many in this District.

5    87. In February 2006, SART sent a second letter to egg donor agencies noting that

6  SART clinics agreed to comply with the ASRM maximum price rules as a requirement of SART

7  membership. It also noted that the names of egg donor agencies who had signed the agreement to

8  comply with the ASRM maximum price rules had been posted on SART's website. The letter then

9  again requested that the egg donation agencies sign such agreement. The letter noted that failure to

10  comply with the ASRM maximum price rules would result in removal of their agencies from the list

11  of SART approved donor programs.

12    88. In July 2011, ASRM's website contained a document listing the names and addresses

13  of all egg agencies that had signed an agreement to comply with the ASRM maximum price rules.

14  It is attached hereto as Attachment A and contains the following text:

15    The egg donor agencies listed below have signed an agreement with the Society for Assisted

16    Reproductive Technology (SART) that they do and will abide by the American Society for

17    Reproductive Medicine (ASRM) Ethics and Practice committees' guidelines governing…

18    financial compensation of oocyte donors.

19    89. In March 2011, SART's website contained a similar list, attached hereto as

20  Attachment B and prefaced by text reading:

21    The egg donor agencies listed below have signed an agreement with the Society for Assisted

22    Reproductive Technology (SART) that they do and will abide by the American Society for

23    Reproductive Medicine (ASRM) Ethics and Practice committees' guidelines governing…

24    financial compensation of oocyte donors.

25    90. Egg donation agencies acknowledge this agreement.

26    91. For example, egg donation agencies and Defendant Class Member

27  ConceiveAbilities, Inc. noted on its website that "ConcieveAbilities strictly adheres to the

28

1 guidelines as established by the American Society for Reproductive Medicine (asrm.org) which
2 state donor compensation more than $10,000 is unethical. Simply stated, a reputable agency will
3 adhere to the guidelines and those that don't should be viewed with extreme skepticism."

4    92.    Egg donation agency and Defendant Class Member A Perfect Match's website notes
5 that "we abide by all ASRM and SART guidelines regarding financial compensation of oocyte
6 donors."

7    93.    Egg donation agency and Defendant Class Member Tiny Treasures, LLC's website
8 notes that it "adheres to ASRM guidelines" and the "compensation requests may not exceed
9 $10,000 per the guidelines set forth by the American Society for Reproductive Medicine."

10    94.    Egg donation agency and Defendant Class Member Conceptual Options' website
11 notes that "we abide by all ASRM and SART guidelines...a single donor will not be paid more than
12 $5,000 without written justification and payments of $10,000 or more are not appropriate."

13    95.    Egg donation agency and Defendant Class Member The Donation Source notes on
14 its website that it "is compliant with all regulations and standards set forth by the American Society
15 for Reproductive Medicine," which would necessarily include the ASRM maximum price rules.

16    96.    Egg donation agency and Defendant Class Member Heartfelt Egg Donation's
17 website states it "has signed an agreement with the Society for Reproductive Technology (SART)
18 that states that we will abide by the American Society of Reproductive Medicine (ASRM) Ethics
19 Committee Guidelines governing the payment of egg donors. The guidelines pertaining to
20 appropriate donor compensation specifically state: 'Total payments to donors in excess of $5,000
21 require justification and sums above $10,000 are not appropriate.' Donors will not be compensated
22 over $10,000 under any circumstance."

23    97.    Egg donation agency and Defendant Class Member The Stork Society's website
24 notes "the ASRM guidelines states that 'total payment to donors in excess of $5,000 require
25 justification and sums above $10,000 are not appropriate.' Donors will NOT be paid over $10,000
26 under any circumstance."

27
28

1    98.    Egg donation agency and Defendant Class Member Beverly Hills Egg Donation's

2  website noted "in compliance with ASRM/SART guidelines, donor fees start at $6,500, but will

3  never be more than $9,500."

4    99.    Egg donation agency and Defendant Class Member Asian Egg Donation LLC's

5  website states its "suggested compensation for donors is $6,000-$8,000.  Compensation requests

6  may not exceed $10,000 per the guidelines set forth by the American Society for Reproductive

7  Medicine (ASRM)."

8    100.    Egg donation agency and Defendant Class Member Peas in a Pod, Inc. notes on its

9  website that "our agency prides itself in adhering to the ASRM's guidelines."

10    101.    Egg donation agency and Defendant Class Member San Diego Fertility Centers'

11  website notes that "egg donors are paid compensation based on American Society of Reproductive

12  Medicine guidelines."

13  **Compliance with ASRM's Maximum Price Rules Has Artificially Suppressed the Price of**

14  **Human Egg Donor Services**

15    102.    ASRM and SART member fertility clinics and egg donation agencies serving ASRM

16  and SART member clinics have successfully suppressed the price for egg donor services to prices

17  within the range set by the ASRM's maximum price rules.

18    103.    A survey performed in 2007 for SART reported that SART member fertility clinics

19  paid an average of $4,217 for egg donor services per donor cycle, while egg donor agencies serving

20  SART member fertility clinics paid an average of $5,200 per cycle.

21    104.    An article recounting the results of that survey was published in the journal *Fertility*

22  *and Sterility*.  The article notes "the vast majority of clinics" area following the ASRM maximum

23  price rules.

24    105.    Defendant Class Members' agreement to comply with the ASRM maximum price

25  rules violates the antitrust laws.  One commenter has made the following observation:

26    This naked price fixing of egg donor compensation is so unusual in the modern United

27    States regulatory environment of unrestrained competition that the most intriguing question

28

1    it raises is not whether it violates the Sherman Act - under existing precedent it does.

2    Rather, the relevant question is how, given the government's substantial enforcement

3    resources and the presence of an active and entrepreneurial plaintiffs' bar, this buyers' cartel

4    has managed to survive unchallenged since at least 2000.

5                                              **Antitrust Injury**

6        106.    During the Class Period, Plaintiff and members of the Plaintiff Class sold egg donor

7    services to Defendant Class Members in the United States.

8        107.    Plaintiff and members of the Class have suffered injury of the type that the antitrust

9    laws are designed to punish and prevent. The price fixing agreement eliminated price competition

10   among ASRM and SART member clinics in the procurement of donor eggs, a necessary component

11   in the provision of assisted reproductive technology services.

12       108.    By collectively agreeing to maintain artificially low prices for donor eggs, Defendant

13   clinics have been able to reap anti-competitive profits for themselves. Plaintiff and the members of

14   the Plaintiff Class have been injured by the absence of a competitive market for the supply of donor

15   eggs because they have been paid less for egg donor services than they would have been paid absent

16   the ASRM maximum price rules. Plaintiffs and the members of the Class were injured and

17   financially damaged in their business and property, in amounts that are not presently determined.

18   As the direct victims of Defendants' antitrust violations, Plaintiffs are efficient enforcers of the

19   antitrust claims made herein.

20       109.    As set forth above, the average hourly rate egg donors receive for egg donation

21   services is approximately the same as the hourly rate received by sperm donors. Since the process

22   of donating eggs is far more painful and risky than the process for donating sperm, a price paid for

23   egg donation services that does not account for those differences must be artificially low.

24

25

26

27

28

CLASS ACTION COMPLAINT                                                                              17

## COUNT I

### Violation of the Sherman Antitrust Act, Section One, 15 U.S.C. § 1

### Maximum Price Fixing

110.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein

111.    Plaintiff brings this claim individually and on behalf of the members of the proposed Plaintiff Class against Defendants ASRM, SART, and members of the Defendant Class.

112.    Defendants have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, by entering into a *per se* maximum price fixing agreement.

113.    In the alternative, if evaluated under the Rule of Reason, the maximum price rules promulgated by Defendants are an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

114.    In promulgating and instituting  the maximum price rules for human egg donor services, Defendants engaged in anti-competitive activities, the purpose and effort of which were to artificially suppress the price paid to Plaintiff Class members for human egg donor services.  These activities include:

    a)   agreeing to pay certain prices for human egg donor services and otherwise set, maintain or stabilize the prices for human egg donor services; and

    b)   paying certain prices for human egg donor services, thereby fixing the price of donor services at the agreed upon rates.

115.    The illegal agreements and conspiracy alleged had the following effects, among others:

    a)   price competition in the human egg donor service market has been restrained, suppressed or eliminated;

    b)   prices paid by Defendants for human egg donor services for assisted reproductive purposes have been fixed, raised, maintained and/or stabilized at artificially low, non-competitive levels by the fixing of prices of human egg donor services;

1    c) payments received by members of the Plaintiff Class for human egg donor services have

2        been fixed, raised, maintained and/or stabilized at artificially low, non-competitive levels

3        by the fixing of prices of human egg donor services; and

4    d) Plaintiff Class members have been deprived of the benefit of free and open competition.

5                              **PRAYER FOR RELIEF**

6        116.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated,

7    seeks judgment as follows:

8            a.    For an order certifying the Plaintiff Class under Rule 23 of the Federal Rules

9                  of Civil Procedure and naming Plaintiff as Class Representative and her

10                 attorneys as Class Counsel to represent the Plaintiff Class members;

11           b.    For an order certifying the Defendant Class under Rule 23 of the Federal

12                 Rules of Civil Procedure and naming Defendants as Defendant Class

13                 Representatives;

14           c.    For an order declaring that Defendants' conduct violates Section 1 of the

15                 Sherman Antitrust Act, 15 U.S.C. §1;

16           d.    For an order declaring the maximum price rules for human egg donor

17                 services null and void;

18           e.    For an order finding in favor of Plaintiff and the Plaintiff Class against

19                 Defendants and the Defendant Class;

20           f.    For an order awarding Plaintiff and Plaintiff Class members three times the

21                 amount of damages sustained by Plaintiff and the Plaintiff Class;

22           g.    For prejudgment interest on all amounts awarded;

23           h.    For an order awarding Plaintiff and the Plaintiff Class their reasonable

24                 attorneys' fees and expenses and costs of suit;

25           i.    For injunctive relief permanently enjoining Defendants, their affiliates,

26                 successor, transferees, assignees, and other officers, directors, partners,

27                 agents and employees and all other person acting or claiming to act on their

28

1   behalf from continuing, maintaining, or renewing the agreement, contract or

2   conspiracy alleged herein, or from engaging in any other agreement, contract

3   or conspiracy having a similar purpose of effect, and from adopting or

4   following a practice, plan, program or device having a similar purpose or

5   effect;

6   j.   For such other further relief the Court deems proper.

7   **DEMAND FOR TRIAL BY JURY**

8   Plaintiff demands a trial by jury of all issues so triable.

9   Dated: August 2, 2011.   Respectfully submitted,

10   **BURSOR & FISHER, P.A.**

11

12   By: _____

13   L. Timothy Fisher

14   L. Timothy Fisher (State Bar No. 191626)
     Sarah N. Westcot (Sate Bar No. 264916)

15   2121 North California Blvd., Suite 1010
     Walnut Creek, CA 94596

16   Telephone: (925) 482-1515
     Facsimile: (925) 407-2700

17   E-Mail:  ltfisher@bursor.com
              swestcot@bursor.com

18

19   **BURSOR & FISHER, P.A.**
     Scott A. Bursor (State Bar No. 276006)

20   369 Lexington Avenue, 10th Floor
     New York, NY  10017

21   Telephone:  (212) 989-9113
     Facsimile:  (212) 989-9163

22   E-Mail:  scott@bursor.com

23

24   *Attorneys for Plaintiff*

25

26

27

28

CLASS ACTION COMPLAINT                                                    20